Filed 6/2/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>BRUCE LEE CLOTFELTER,<br><br>     Defendant and Appellant. | A155659, A155683<br><br>(Napa County Super. Ct.<br>Nos. CR174307, 18CR000792) |

**INTRODUCTION**

Defendant Bruce Lee Clotfelter was convicted of multiple counts of child molestation in the 1980's and sentenced to 10 years in state prison. After he served his sentence and was released from prison, he was later found to be a sexually violent predator (SVP). While Clotfelter was held in a state hospital as an SVP, he volunteered to be surgically castrated, a procedure that took place in 2001. In June 2007, Clotfelter was unconditionally released from the state hospital, and subject to lifetime registration as an SVP.

During a routine sex offender compliance check and search of Clotfelter's residence in October 2016, an officer found evidence that he had formed relationships with three minor boys (two were brothers) and their respective families. Clotfelter was charged with sexual offenses and other crimes.

1

In September 2018, after a trial on the sexual offenses, a jury convicted Clotfelter of two counts of annoying or molesting a child (Steven) under the age of 18 (Pen. Code,[1] § 647.6, subd. (c)(2) [counts 1 & 2]), two counts of contacting or communicating with a 14 or 15-year-old child (B.H.) with the intent to commit a sexual offense (§§ 288.3, subd. (a), 288, subd. (c)(1) [counts 3 & 4]), and two counts of contacting or communicating with a child under the age of 14 (E.H.) with the intent to commit a sexual offense (§§ 288.3, subd. (a), 288, subd. (a) [counts 5 &6]).

Clotfelter contends there was insufficient evidence to support his conviction on the counts of annoying or molesting Steven, then 15 years old. He also contends that in any event the entire judgment must be reversed for prejudicially ineffective assistance of counsel that deprived him of a fair trial. Clotfelter argues that defense counsel consistently failed to object to inadmissible, irrelevant, and prejudicial evidence. This includes defense counsel's consistent failure to object to inadmissible expert testimony that Clotfelter had the requisite mental states to commit the charged crimes and in fact was guilty; failure to object to the admissibility of expert testimony on child sexual abuse accommodation syndrome that was irrelevant and prejudicial; and failure to object to irrelevant and prejudicial testimony about his prior sexual offenses that went well beyond the parameters of Evidence Code section 1108. We conclude that the evidence was insufficient to support the convictions on counts 1 and 2, and that trial counsel's deficient performance warrants a reversal. Accordingly, we reverse the judgment.

_____

[1] All further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Prosecution's Case

**A.** *Steven (Counts 1 & 2)*

In September 2007, Clotfelter moved to Napa County, where he joined a local church. His brother-in-law, Gary Stewart, was a member of the board of elders at the church. Clotfelter told the board of elders about his past. Knowing Clotfelter had been punished for his prior crimes, Stewart forgave him and welcomed him into the community.

Clotfelter became friends with many people through the church, among them Tom,[2] his wife, and their children, including their 15-year-old, Steven. Clotfelter told Tom that he had gone to prison for child molestation. Clotfelter was a regular guest at Tom's home and became like a member of the family.

Steven testified at trial; he was then 25 years old. Clotfelter saw Steven at least once a week at family gatherings and church events. Over time, Clotfelter became like a father figure or older brother to Steven. They regularly communicated by email. During the course of their friendship, which lasted over two years, Clotfelter bought Steven clothing, running shoes, an electronic drawing tablet, and exercise equipment ("ab straps" for working out the "core").

Steven knew at the time that Clotfelter had been to prison but did not know the nature of his offenses. Steven was not troubled by Clotfelter's past because he believed strongly that people could change and should be forgiven. It was normal for Steven to have physical contact with Clotfelter through hugs, and neck and shoulder massages. On at least one occasion, Clotfelter, a

---

[2] We refer to some persons by their first names and initials for privacy. (See Cal. Rules of Court, rule 8.90.)

3

former gymnast, went with Steven to a gym and spotted Steven as he tried to perform a back tumble. Steven never felt uncomfortable about being around Clotfelter. Clotfelter never tried to kiss or touch him inappropriately, never discussed sexual matters with him, and never tried to show him anything "creepy" or "weird." Steven loved and trusted Clotfelter, and thought their hugs and handshakes were appropriate. Steven never contacted law enforcement about Clotfelter.

Steven's older sister testified that she felt uncomfortable with Clotfelter's overly familiar manner with her younger siblings. She thought he sat too close to them on the sofa; he put his arm around them, held their hands, and would play a game with them where they poked each other in the ribs. At some point, their mother told her Clotfelter had been in prison for child molestation and that the church was requiring him to tell the community about it. Their mother was upset that Clotfelter was being unfairly targeted because she felt Clotfelter had changed. Steven's sister testified she was "shocked" her parents had welcomed Clotfelter into their home knowing his history.

*Church Tells Clotfelter Not to Contact Minors*

Parishioner Erik Olson, who was also a Napa County deputy sheriff, became aware of Clotfelter's "290 status" in or about 2008. Olson testified that he felt the church congregation needed to be notified about Clotfelter's past. In the fall of 2009, the church required Clotfelter to advise the congregation that he had been in prison for child molestation. Following this disclosure, the church instructed Clotfelter not to have contact with minors on church premises. Steven testified he and Clotfelter would still talk to each other "in passing" at church and they continued to maintain regular email contact.

4

*Emails*

The prosecution introduced many emails between Clotfelter and Steven into evidence, dated from August 30, 2009, to January 25, 2010.

For example, Clotfelter sent Steven an email entitled "A friendly thought" with a picture of a person running near mountains, which read: "Hey, I got this photo for my friend Kevin and I thought about you. I think Chamonix, France would be an amazing place to run . . . or walk, bike, sit, veg, etc.[] Anyway, I was thinking about you and wanted to say goodnight."

Referring to a church men's retreat he and Steven attended, Clotfelter sent another email that read: "[T]hank you for being my friend. I had a great time this weekend and I'm glad you were there. I'm so sorry about having to ask you not to hug me at church. It's a horrible thing that I can't show you how much I care with a hug, but there will be people that will talk and I love you way too much to allow the sin of my past to stain you in any way. So, I'll give you a hug when I come over to your house!! [¶] By the way, when you told me that you already knew about 'the' crimes I was blown away. You've always treated me like you didn't know and for that I'm grateful. [¶] I really hope, and pray, my sharing all that trash on Saturday night didn't harm you in any way, because I'm nervous about that. [¶] You're awesome!! I'll see you sometime this week. [¶] Love ya pal[.]"

On October 3, 2009, Clotfelter sent Steven an email entitled "Friendship," writing: "As usual, you've brought me joy and laughter. . . . I'm also grateful you feel our friendship got deeper tonight. I feel the same way and regardless of what the leadership of the church chooses to do, I will continue to be your friend . . . even if it means choosing to attend another church, which would grieve me." Steven wrote back, "Our friendship will stay the same regardless of what gets in our way. Nothing can break it. And

if you ever feel . . . differently, I may take on a tone similar to my dad's and call you a moron. [¶] In all seriousness, though, I know it's going to be tough Sunday morning. Just know that I'll always be here for you, no matter what." Clotfelter responded, "Thanks. I'd be a total moron to let anything get in the way . . . so I won't. PERIOD!!"

On October 4, 2009, Clotfelter and Steven exchanged emails about singing together in the choir. Clotfelter wrote, ". . . not being able to sit next to you, or even talk to you is gonna kill me. So, you'll just have to keep in mind that although I've got a bunch of friends in that room, you're my best bud." Steven replied that he felt "more remorse over losing the ability to interact with you for the next two years of my life than I did when I was at my most recent relative's funeral. . . . Just know this: you're going to have one hell of a big hug come my 18th birthday." Clotfelter replied, "Are [*sic*] being told we can't interact for 2 years . . . at all . . . ever?" Steven responded, "Pretty much. Unless I'm mistaken, there's not much we can do. Obviously no physical contact, pretty much no talking with each other, and I'm not sure our corresponding via the internet is all that wise (that is, however, debatable)." Clotfelter wrote back, "I'll talk with your mom and dad about all this. I'm absolutely not okay with the prospect of have [*sic*] no contact with you for 2 years. [] At face value it is totally unacceptable!!"

Clotfelter gave Steven a piece of exercise equipment they referred to as "ab straps." On October 5, 2009, Clotfelter wrote, "To my best friend living in exile . . . Your ab straps have arrived. I'll bring them over when I return your dad's trailer." Steven wrote back, "Bwahahahaha. Abs! I'll have bigger abs!" Clotfelter replied about a week later, "Hello my friend. I know this may be unwise, but I've been known for unwise behavior before. How are your abs?" Steven replied, "Absolutely wonderful (meaning they hurt insanely bad but

look rather impressive).  Honestly, I'm shocked at how well they are working over such a short period of time."  Clotfelter responded, "That's great!! Hopefully, someday I'll get to see them. [¶] Are you okay with emailing me?"  The following morning, Steven replied, "Of course I'm 'ok' with it.  It's just a matter of whether or not others are ok with it.  What would the church leaders think if they found out that we were contacting each other via e-mail?"  Clotfelter responded: "Even if I can't get the rules changed to something that is reasonable (meaning we can have contact away from the church) the rules state that I can't [*sic*] physical or social (verbal) contact.  They say nothing about electronic, so in the absence of a specific rule I will choose to exercise my liberty.  I won't tell them and I'm assuming you won't either.  I'd say that takes care of the 'what if's.' "

On October 18, 2009, Clotfelter wrote about a planned backpacking trip next summer asking, "If I can get permission to take a 17-year-old with me do you still want to go?"

On October 23, 2009, Clotfelter wrote: "As much as I would love for you to be 18, so all the nonsense would be over, I want you to enjoy being 16! This is a great time of life for you and I want more than anything for you to relish it.  You're right when you say that 2 years will go quickly, but please don't let a single day get past without thanking the Lord for it and making it special.  I pray for you every day and I love watching how the Lord is shaping you into one of the most extraordinary young men I've ever known. [¶] You made my week when you said I was your hero!  And although I think you should be more careful in choosing your hero, I know I've made the right choice."

On November 1, 2009, Clotfelter wrote, "Patience is the gift God gives to those who learn how to wait for His blessings.  Our restored friendship is

one of the blessings for which I *eagerly* wait.  1 year, 8 months and 2 days . . . and counting."

On January 1, 2010, Clotfelter wrote a new year's message to Steven, signing it, "You are my friend and brother, Steven . . . I have been and always shall be yours."

*Discovery of the Emails*

In early February 2010, Steven's sister checked Steven's email and found the correspondence with Clotfelter.  She told her father about the emails, but he seemed unconcerned about them, and unhappy about having to end his friendship with Clotfelter.  She showed the emails to Clotfelter's brother-in-law, Gary Stewart.  Stewart did not like the emails and asked Clotfelter not to contact Steven anymore.

A church elder board member, Oscar Otero, testified that he read the emails at the time.  Otero was a "bit bothered" by them because Clotfelter was "connecting with a younger person[,]" despite the church's policy and Clotfelter's history.  However, Otero found no language indicating anything other than "normal conversation" between Steven and Clotfelter.

Steven's sister thought that neither of her parents seemed concerned that Steven was, in her view, potentially being preyed upon.  It seemed to her they were more upset about Clotfelter getting into trouble.

**B.   *B.H. and E.H. (Counts 3, 4, 5 & 6)***

In 2007, Clotfelter became friends with Brenda  through the same church.  After Brenda moved to Southern California in 2010, she introduced Clotfelter to her daughter Heidi, who lived there with her husband and their three children, B.H., E.H., and a daughter, who were then approximately eight, nine, and 10 years old.  Over time, Clotfelter became friendly with Heidi's family.  Clotfelter told Brenda that he was a registered sex offender,

but he lied and said it was because of a "dare" related to money that involved touching a 12-year-old boy's penis, and it had no sexual implications.

Brenda and her husband visited her mother and stepfather in the Midwest every year, often bringing their grandchildren. In 2011 or 2012, Brenda began inviting Clotfelter to join them. Clotfelter also accompanied Brenda and her family, including Heidi and her family, to Arizona over New Year's two or three times, where they stayed together in a rented house.

When Clotfelter went to the Midwest, Brenda and her family stayed inside the house; Clotfelter slept in a camper on the property. On one occasion, B.H. and E.H. asked to sleep in the camper with Clotfelter rather than on the floor in their great-grandmother's house. The boys were approximately 10 and 12 years old at the time.

Brenda never saw Clotfelter do anything inappropriate with her grandsons.

Clotfelter helped Heidi and her husband financially, giving them money for a security deposit on a house, helping them buy a car, putting money in their bank account, and getting them credit cards. Clotfelter bought everyone in Heidi's family gifts, and they bought gifts for him. Clotfelter treated Heidi's children equally and did not give E.H. and B.H. anything extra.

Heidi never saw Clotfelter act inappropriately with her children. She and her husband knew Clotfelter was a convicted child molester because he had told them, although he did not discuss the details of his past with them. They felt like they knew Clotfelter well and were not concerned about letting their children spend time with him. On account of their professions, they were both mandated reporters of abuse. Their sons never complained about

Clotfelter touching them inappropriately and Heidi never saw signs that they were molested, such as changes in their behavior.

B.H., who was 18 years old at the time of trial, testified that he thought of Clotfelter as a family member. The brothers often hung out with Clotfelter. It was common for Clotfelter to have physical contact with B.H. through hugs and wrestling. Clotfelter never did anything that made B.H. feel uncomfortable.

B.H. recalled a family trip to the Midwest with Clotfelter and without E.H. Clotfelter and B.H. shared a bed in the camper for two or three nights. On another family trip to the Midwest, Clotfelter, B.H., and E.H. all slept in the camper together. B.H. believed he and E.H. slept together on the bed and Clotfelter slept on the couch. Clotfelter never touched B.H. inappropriately.

E.H., 15 years old at the time of trial, testified that Clotfelter went to the Midwest with him, B.H., and their grandparents when E.H. was 12 or 13. Clotfelter, E.H., and B.H. all slept in the camper. Two people slept on the bed and one person slept on the couch. They rotated who slept where each night because the couch was not very comfortable. At different points, Clotfelter was in the bed with either E.H. or B.H. Clotfelter never touched E.H. inappropriately.

Following Clotfelter's arrest in 2016 on the charges involving her grandchildren, police gave Brenda more information about his criminal history. Brenda still did not believe that Clotfelter had done anything wrong to her grandchildren. She believed he was a changed person. Brenda stayed in touch with Clotfelter and tried to help him with his court case. Brenda testified that she and her husband believe "to this day" that Clotfelter is not the person he used to be, and they would not have done anything differently if they had known the true nature of Clotfelter's past.

10

## C. *Evidence of Prior Crimes from the 1980's*

The prosecution led off the first two days of trial testimony by presenting six witnesses who testified about Clotfelter's prior crimes from the 1980's. As we discuss below, the prosecution's first witness was an expert in child sexual abuse accommodation syndrome. After that, the next five witnesses testified about Clotfelter's sexual offenses in the 1980's. On the second day, a psychologist (Dr. Arnold) who evaluated Clotfelter in the early 2000's when he was confined in the state hospital testified, followed by a sixth witness concerning the 1980's, and two witnesses concerning events in 1995. The testimony about the charges in this case did not begin until the third day of trial testimony.

Mary T. met Clotfelter in the 1980's when she was living in Butte County with her husband and their four sons. Clotfelter was the recreation director at a church summer camp that two of her sons (including one named G.T.) attended. Clotfelter became close to the boys and the family and would sometimes stay overnight over the weekend.

G.T., 44 years old at the time of trial, testified that he was around seven years old when he met Clotfelter through church camp. They spent a lot of time together and G.T. looked up to Clotfelter, considering him "like a hero." Clotfelter frequently stayed overnight on the family's pull-out sofa.

On one occasion when G.T. was 12, Clotfelter stayed overnight, as did G.T.'s friend Michael. They all slept in the sofa bed with Clotfelter in the middle. G.T. woke up in the middle of the night and felt Clotfelter's hand in his underwear, fondling his penis. He did not say anything but rolled over so that Clotfelter's hand could slide out. The next morning, he told Michael what Clotfelter had done. G.T. did not tell his parents. Afterward, they continued their relationship like nothing had ever happened.

11

Lois V. testified she met Clotfelter in the 1980's when her children attended church camp in Butte County. Clotfelter seemed to want to spend time with them and frequently came over unannounced. Clotfelter enjoyed being with the V. children and he seemed like "a big kid."

Benjamin V., 42 years old at the time of trial, testified that he was around 11 years old when he met Clotfelter through church. Clotfelter visited their house frequently and Benjamin and his brother James enjoyed playing with him. It was typical for Clotfelter to hug Benjamin and put his arm around him.

One day, when Benjamin was about 13, he and James got permission to spend the night with Clotfelter at a home where he was housesitting. The three of them slept together in one bed with Clotfelter in the middle. Benjamin woke up and felt Clotfelter's hand inside his underwear, playing with his penis and testicles. He called out Clotfelter's name and turned away. Clotfelter pulled his hand away and Benjamin went back to sleep. A few days later, James told Benjamin that Clotfelter had also done something to him that night; a few days after that, the boys told their father what had happened.

Brian A., 42 years old at the time of trial, testified that during the 1980's he lived across the street from the V. family. The V. family brought him to their church, where he met Clotfelter when he was about 10 years old. Brian spent time with Clotfelter through church youth group and camp activities, and he grew to love and trust him.

One night, when Brian was about 12, he spent the night at the V. family's house. Clotfelter was housesitting for the V. family. Brian and Clotfelter fell asleep while watching movies on the sofa bed. Brian awoke and found that Clotfelter had put his hand down his pants and was touching

12

his penis. Brian immediately returned to his own house across the street. About a week later, James (the youngest of the V. children) told Brian about "some of the things that had happened to him." That evening, Brian told Mr. and Mrs. V. what had happened to him and what James had told him.

Katherine G. testified that she met Clotfelter through church in the 1980's when she was living in Butte County. Clotfelter was close to Katherine's father and he came to their house often, as did the V. family. One day after a party at Katherine's home, Clotfelter stayed and asked to talk to her.. Clotfelter and several church families were about to leave for a winter camp. Clotfelter told Katherine the V. family was upset at him and there might be some tension. He explained that there was a misunderstanding about him touching their son James while they were sleeping in the living room. Katherine saw the V. family the next day at camp and believed they were shaken. When she returned from camp, Katherine contacted the district attorney's office. Later, she spoke to Clotfelter on the phone while he was in jail. Clotfelter asked Katherine to get some things from his bedroom, including a list of "boys he had been involved with." She found it and gave it to the district attorney. There were symbols and codes next to the names that she did not understand.

## D.    *Clotfelter's Impersonation of a Military Officer in 1995*

In January 1995, Clotfelter was arrested on a probation violation for impersonating a military officer. Law enforcement found a military uniform, camera equipment, and maps containing the "locations of grammar schools in the area" in Clotfelter's car. They also found a business card in Clotfelter's wallet for a person named Jeff Sartz.

Sartz testified on the second day of trial that shortly before Clotfelter's 1995 arrest, Clotfelter entered his real estate office, wearing a military-style

13

flight suit with bars and a name tag that said "Talon Fox." Clotfelter told Sartz he owned properties in other areas, including Italy, and that he wanted to look at houses because he was going to be stationed at nearby McClellan Air Force Base. Clotfelter pointed to a photograph of Sartz's then 11-year-old son and said, "I know him," explaining he had given a presentation at the son's school. Clotfelter said he flew some of the Dallas Cowboys around and that he had a football signed by Troy Aikman that he wanted to give Sartz's son. Sartz wrote his address and son's name on his business card, as Clotfelter said he wanted to drop the football off to the son himself.

**E.** ***Police Investigation in 2016 Leading Up to Clotfelter's Arrest in This Case***

Napa Police Sergeant Amy Hunter testified that while searching Clotfelter's bedroom during a routine sex offender "compliance check" on October 28, 2016, she found videos of young boys who Hunter understood to be within Clotfelter's "target range." Clotfelter told Hunter that they were the children of close friends who lived in Southern California. Hunter later identified two of them as E.H. and B.H.

During a subsequent search of Clotfelter's residence, Hunter seized computers; drives with videos of E.H. and B.H., photographs of Steven, E.H. and B.H., text messages with Brenda and Heidi and their families, and emails with Steven.

**F.** ***Expert Testimony***

1. *CSAAS Testimony*

The first witness the prosecution called to testify at trial was Blake Carmichael, Ph.D., a psychologist and an expert in child sexual abuse accommodation syndrome (CSAAS). Dr. Carmichael testified about common misconceptions relating to child victims, and the nature of child molesters

14

and how they can become personally intertwined with a victim's family. We further discuss this testimony in section II.C. of the Discussion, *post*.

2. *Psychiatric and Clinical Psychologist Testimony*

Dr. Dale Arnold, a clinical psychologist with the Department of State Hospitals, testified as an expert in the diagnosis of mental disorders and recidivism as it relates to sex offenders. Dr. Arnold evaluated Clotfelter in 2004 to determine if he qualified as an SVP and conducted updated evaluations in March and September 2005. He had not evaluated Clotfelter since that time.

In 2004, Dr. Arnold diagnosed Clotfelter with pedophilia and a personality disorder with narcissistic and antisocial features. Dr. Arnold testified that pedophilia is not limited to physical gratification but is also about gratifying intimacies. In Dr. Arnold's opinion, Clotfelter satisfied his intimate needs by interacting with children and met the criteria for pedophilia, notwithstanding his physical castration in 2001. In his 2004 evaluation, Dr. Arnold opined that Clotfelter was likely to reoffend sexually if unconditionally released into the community; although the 2001 castration lowered his sex drive, Arnold's view was that Clotfelter still needed supervision two to three years later because he had molested children for both sexual and intimacy reasons.[3]

Dr. Renee Sorrentino, a forensic psychiatrist and assistant professor at Harvard Medical School, testified as an expert in sex offenders and paraphilic disorders. She was asked to give her opinions on whether Clotfelter's current behavior was consistent with his previous history of sexual offending;

---

[3] Despite Dr. Arnold's view at the time, others at the Department of State Hospitals disagreed and Clotfelter was released without supervision in 2007.

15

whether he experienced sexual behavior after his surgical castration in 2001; and whether he demonstrated any nonsexual risk factors for sexual reoffending. She based her opinions on Clotfelter's criminal records, state medical records, and prior statements and writings, as well as a personal interview she conducted with Clotfelter on May 21, 2018.

According to Dr. Sorrentino, the degree to which castration affects sexual function varies greatly; for some, it does not impact their sexual behavior or function. She believed that studies on sexual offender recidivism after surgical castration are of limited utility due to the small sample size, lack of control groups, and lack of standardization.[4] The existing studies reported a recidivism rate between zero and 10 percent. Dr. Sorrentino herself had seen three individuals who had sexually reoffended after castration.

Dr. Sorrentino diagnosed Clotfelter with pedophilic disorder and an unspecified personality disorder with antisocial traits. According to Dr. Sorrentino, behavior that may not appear sexual to onlookers, like hugging, tickling, wrestling, bathing, or holding a child may be arousing to a pedophile. It is common for pedophilic behavior to begin with innocuous behavior to desensitize the child before engaging in overt sexual behavior. She opined that Clotfelter's pedophilic disorder was specified as "exclusive" as he was attracted to prepubescent boys. This category of pedophiles has the highest recidivism rate.

---

[4] Dr. Sorrentino testified that the current standard of care is chemical rather than surgical castration because it is safer and reversible. As noted, Clotfelter chose surgical castration.

## II. Defense Case

Dr. Mary Flavan testified as an expert in forensic psychiatry relating to sex offenders suffering from pedophilic disorder. She testified that physical castration can be an effective treatment for sex offenders, with recidivism rates being between two and three percent and zero.

Dr. Flavan interviewed Clotfelter on August 24, 2018. She testified that Clotfelter "had put himself into situations which were he not castrated he would not have been able to control his feelings." She acknowledged that Clotfelter has a long-standing problem of enjoying the attention of 10 to 12-year-old boys "that seems to be a very rewarding kind of involvement for him, even without the sexual component." Dr. Flavan opined that the castration surgery worked for Clotfelter, and he is no longer a danger to the community. Clotfelter has control over his sexual behaviors and no longer has any desire to molest children. His risk of reoffending is no more than anyone else who has been castrated. Although castration changed Clotfelter's risk of reoffending, it did not change the fact that he has pedophilic disorder, for which there is no cure.

Clotfelter testified in his own defense. He admitted to eight prior felony convictions. In the 1980's, he molested children of people he knew from church by fondling them while they were sleeping and was convicted and sentenced to prison. After his release, he posed as a Navy fighter pilot and visited 27 schools in December 1994 and January 1995. He did not molest anyone during that time nor intend to do so; he simply wanted to be looked up to and thought of as "honorable."

As a result of impersonating a military pilot, Clotfelter once again went to prison. He was then committed to the state hospital as an SVP. In 2001, he voluntarily sought surgical castration. Clotfelter testified that he felt a

17

"profound change" after the castration surgery and knew he would never molest another child. He then began participating more seriously in treatment at the state hospital and finished four out of the five phases of the treatment program. He did not enter the final phase of treatment because he was released. Upon release, he was required to register as a sex offender, but he was not restricted from contact or socializing with minors.

Clotfelter testified that there were pictures of Steven in his computer because he was Facebook friends with Steven's sister, who had posted the photographs. He denied having downloaded the photographs for sexual reasons. Clotfelter testified that when he committed sexual offenses before his surgical castration, his target range was boys between nine and 12. Steven was 15 and 16 when Clotfelter knew him, and Clotfelter testified he was not sexually attracted to him.

Clotfelter acknowledged that he had been sexually attracted to his victims in the 1980's and purposely arranged to sleep with them so that he could molest them. Clotfelter denied that this was his purpose with B.H. and E.H. He did not try to molest them nor did he think about doing so. Clotfelter described himself as a "changed man" after his surgery, and testified he no longer had the desire to molest a child.

Clotfelter admitted molesting four boys in his past: James and Benjamin V., G.T., and Brian A. (three of whom had testified at this trial). Clotfelter also admitted he had been convicted one month before the trial in this case of perjury, forgery, identity theft, and grand theft, all felonies.[5]

---

[5] On February 4, 2021, we issued an opinion, affirming Clotfelter's convictions for perjury, forgery and identity theft, reversing the theft convictions, vacating the aggregate sentence, and remanding for resentencing. (A155134 [nonpub. opn.], modified with no change in judgment on Mar. 5, 2021.)

## DISCUSSION

## I. Insufficient Evidence to Support a Conviction for Annoying or Molesting a Child

Clotfelter contends the prosecution failed to prove counts 1 and 2, annoying or molesting Steven, because there was insufficient evidence to establish that his conduct was objectively and unhesitatingly irritating or disturbing within the meaning of section 647.6. This contention requires that we look closely at the elements of this offense.

### A. *Standard of Review*

"It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.) In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We consider whether " ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Rich* (1988) 45 Cal.3d 1036, 1081.)

**B.** *Applicable Law*

Section 647.6, subdivision (a)(1), states a misdemeanor offense for every person who "annoys or molests any child under the age of 18." Under subdivision (c)(2) of section 647.6, the same conduct is a felony, where, as here, the defendant has a prior conviction for an enumerated sex offense.[6]

To convict a defendant of violating section 647.6, the prosecution must prove: (1) the defendant engaged in conduct directed at a child; (2) a normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct; (3) the defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child; and (4) the child was under the age of 18 years at the time of the conduct. It is not necessary that the child actually be irritated or disturbed or that the child actually be touched. (CALCRIM No. 1122; *People v. Lopez* (1998) 19 Cal.4th 282, 289 (*Lopez*).)

On appeal, Clotfelter argues that the evidence at trial was insufficient as a matter of law with respect to the second element of section 647.6— objectively annoying conduct. *Lopez* informs our decision. There, the California Supreme Court discussed the requirements for violating section 647.6 in the context of determining whether that offense was a necessarily included lesser offense to section 288. (*Lopez, supra,* 19 Cal.4th at pp. 290-291.) *Lopez* "observed that the words 'annoy' and 'molest' in former section 647a (now section 647.6, subdivision (a)) are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to

---

[6] Clotfelter was charged in counts 1 and 2 with two counts of felony child molesting (§ 647.6, subd. (c)(2)) as a felony based on his 1989 convictions for violating section 288 (lewd and lascivious acts involving children).

20

injure, another person. [Citations.]" (*Id.* at pp. 289-290.) *Lopez* further explained that in determining "whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, we employ an *objective* test not dependent on whether the child was in fact irritated or disturbed." (*Lopez, supra,* 19 Cal.4th at p. 290.) In this regard, "childish and wholly unreasonable subjective annoyance is not covered." (*Ibid.*)

In concluding that section 647.6 was not a lesser included offense of section 288, *Lopez* explained that unlike section 288, subdivision (a)—which may be violated by a touching with lewd intent, even where the touching is innocuous or inoffensive on its face—violation of section 647.6 requires an act that is "*objectively and unhesitatingly viewed as irritating or disturbing . . . .*" (*Lopez, supra,* 19 Cal.4th at p. 290.) Thus, under this test, "not every touching with lewd intent will produce the objective irritation or annoyance necessary to violate section 647.6." (*Ibid.*)

For example, as noted in *Lopez*, "a lewdly intended embrace innocently and warmly received by a child might violate section 288, without violating section 647.6, if a normal person would not unhesitatingly find the embrace irritating or disturbing. Physical affection among relatives, generally considered acceptable conduct, nonetheless could satisfy the 'any touching' aspect of section 288, subdivision (a), and violate that section if accompanied by the requisite lewd intent. However, this objectively inoffensive behavior would not violate section 647.6, subdivision (a)." (*Lopez, supra,* 19 Cal.4th at pp. 290-291.)

*Lopez* expressly rejected the notion that the nature of the conduct at issue under section 647.6 is evaluated by examining the conduct together with the actor's motivations and mental states. (*Lopez, supra,* 19 Cal.4th at p. 291.) Rather, the court explained that the actor's conduct must be divorced

from consideration of what motivated the actor.  (*Ibid.*)  *Lopez* further noted that in every reported case in which the courts have upheld convictions under section 647.6, the defendant's objective conduct would have unhesitatingly irritated or disturbed a reasonable person had it been directed at that person regardless of the defendant's intent.[7]  (*Ibid.*)

Thus, to constitute a violation of section 647.6, both an objective and subjective element must be proven: (1) the existence of objectively and unhesitatingly irritating or disturbing conduct; and (2) motivated by an abnormal sexual interest in children.  "[T]he actor's mental state is disregarded in evaluating whether the element of objectively disturbing conduct has been met." (*Lopez, supra,* 19 Cal.4th at p. 291; see *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1162-1163  (*Valenti*), superseded by statute on other grounds as stated in *People v. Brooks* (2018) 23 Cal.App.5th 932, 945, fn. 17 ["defendant's observable conduct, *on its own*, must unhesitatingly irritate or disturb a reasonable person; in evaluating it, we

---

[7] The objectively offensive conduct has been found to include, for example, instructing a 10 or 11-year-old to pose with her legs spread apart to photograph her crotch area (*People v. Kongs* (1994) 30 Cal.App.4th 1741, 1751); following a child on a bicycle and making provocative hand and lip gestures (*People v. Thompson* (1988) 206 Cal.App.3d 459, 464-467); squeezing and rubbing a 10-year-old's vaginal area and buttocks (*People v. Monroe* (1985) 168 Cal.App.3d 1205, 1213); vaginally penetrating a seven-year-old (*People v. Tate* (1985) 164 Cal.App.3d 133, 136); bribing a 13-year-old to have oral sex (*People v. La Fontaine* (1978) 79 Cal.App.3d 176, 179 (*La Fontaine*), disapproved on another point in *Lopez, supra,* 19 Cal.4th at pp. 292-293); holding children against their will (*In re Sheridan* (1964) 230 Cal.App.2d 365, 370-371); lifting an eight-year-old by the buttocks and rubbing against her (*People v. Moore* (1955) 137 Cal.App.2d 197, 201-202); and exposing one's penis to a seven-year-old girl (*People v. McNair* (1955) 130 Cal.App.2d 696, 697).

may not consider either the defendant's intent or the child's subjective discomfort"][8].)

## C. *Insufficient Evidence of Objectively and Unhesitatingly Irritating or Disturbing Conduct*

We conclude the evidence is insufficient to establish that Clotfelter's conduct—including the emails and gifts—was objectively irritating or disturbing under the statute.

The Attorney General contends that although no single email "viewed in isolation would disturb a normal person without hesitation, viewed in toto, they would disturb most." However, the totality that the Attorney General wants us to consider is "[t]he content of the e-mails, their frequency, and the circumstances under which they were written, considered together with appellant's known history as a child molester . . . ." In other words, the prosecution would have us characterize Clotfelter's conduct as objectively disturbing because he is a convicted child molester. But viewing the objective conduct in light of Clotfelter's past blurs the objective and subjective elements of the crime, and *Lopez* expressly rejects this approach. (*Lopez, supra,* 19 Cal.4th at p. 291.)

---

[8] In *Valenti, supra,* 243 Cal.App.4th 1140, the defendant's conduct in hugging one child three times and kissing another on the top of the head was not objectively disturbing in light of the defendant's lengthy, close relationship with the children's family, and thus two convictions under section 647.6 were reversed. (*Id.* at pp. 1162-1163.) By contrast, conduct with other children who defendant had known for less than five weeks (hugging, incessantly telephoning, placing the children on his lap while driving, causing the children's mother to feel they were being "stalk[ed]") supported a conviction under section 647.6 as objectively irritating and annoying. (*Id.* at p. 1163.) The court further described the defendant's conduct with these other children as "alarming[,]" as he hugged and kissed the boys upon second meeting and tried to see them every day. (*Ibid.*)

23

Steven and his family (except for his sister) had a close relationship with Clotfelter over several years. He was considered part of the family, and Steven thought of Clotfelter as a "father figure" and "older brother." In that context, it was not objectively disturbing within the meaning of section 647.6 for them to be together or exchange emails or gifts. Although Clotfelter's communications with Steven after the church admonished him to have no physical contact with minors on church premises may have been ill-advised, it was not a violation of a legally binding order, and there were no legal restrictions prohibiting Clotfelter from being with minors.

Read in their entirety, there was no language in the emails that was objectively irritating or annoying. The "abs" references are not sexual or obscene in the context of Steven's exercise regimen. Clotfelter's expressions of love and affection were seemingly reciprocated. They were not "umistakably lewd and obscene." (Cf. *La Fontaine, supra,* 79 Cal.App.3d at pp. 179, 185 [defendant's statement to a 13-year-old hitchhiker to give him a "blow job" was "unmistakably lewd and obscene"].)

Our Supreme Court's decision reversing a molestation conviction in *People v. Carskaddon* (1957) 49 Cal.2d 423 (*Carskaddon*) is instructive. There, the defendant was convicted of child molestation under the predecessor statute to section 647.6, after police found him walking with a six-year-old girl. (*Carskaddon* at p. 425.) The defendant claimed the girl was lost and he was taking her home, although her house was in another direction. (*Ibid.*) In the defendant's presence, an officer asked the girl if the defendant was taking her home. (*Ibid.*) "The officer testified that she replied, 'No, he was taking her down the river to show her . . .]' The officer's testimony was interrupted at this point, and he did not complete his recital of the girl's statement. The officer did not see defendant make any motions

24

with his arms or any other part of his body toward the girl but only observed them 'walking side by side down the street.' " (*Ibid.*)

The conviction was reversed because the meaning of the defendant's conduct was ambiguous. The court concluded there was no substantial evidence that the conduct was anything other than "friendly noncriminal activity," although there were certainly inferences that could be drawn of a sexually provocative nature. (*Carskaddon, supra,* 49 Cal.2d at p. 426.) But the court held that those inferences were conjecture. (*Ibid.*)

The lesson of *Carskaddon* is applicable here. Ambiguous conduct is not enough to satisfy the statute. Here, Clotfelter bought Steven gifts, including the "ab straps" Steven requested. He did not solicit sex or any quid pro quo. Clotfelter's hope to see Steven's "abs" some day had an innocent explanation in the context of seeing the result of his exercise program. The hugs, gifts, and emails do not amount to substantial evidence of conduct that would objectively unhesitatingly disturb a normal person. The evidence fails to show Clotfelter violated section 647.6. (*Carskaddon, supra,* 49 Cal.2d at p. 426.)

That Steven's sister and two church elders may have been irritated by Clotfelter's conduct does not alter our conclusion. The test is not whether specific people were bothered by the conduct, but whether Clotfelter engaged in objective conduct that would irritate or disturb any normal person. (See *Lopez, supra,* 19 Cal.4th at p. 291.)

In sum, because there is no substantial evidence of criminal activity on the part of Clotfelter toward Steven, counts 1 and 2 must be reversed.

## II. Ineffective Assistance of Counsel

Clotfelter contends his trial counsel committed numerous errors that prejudicially deprived him of effective assistance of counsel and a fair trial.

We focus primarily on Clotfelter's contentions that his trial counsel failed to object to inadmissible and prejudicial testimony on several significant topics.

**A.** *Standard of Review*

"The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the ' "right to the effective assistance of counsel at trial." ' [Citations]; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) 'The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result.' (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 . . . .)" (*In re Long* (2020) 10 Cal.5th 764, 773 (*Long*).)

To prevail on a claim of ineffective assistance, a defendant must establish his counsel's performance fell below an objective standard of reasonableness and resulting prejudice. (*People v. Catlin* (2001) 26 Cal.4th 81, 162-163.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569; see *Strickland, supra,* 466 U.S. at pp. 687-688.)

A claim of ineffective assistance based upon a failure to object to inadmissible evidence will not usually succeed on direct appeal. "Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to

object seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621.)  In light of the deferential standard, appellate courts do not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight and, for this reason, tactical errors do not generally provide a basis for reversing a conviction.  (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

**B.**     ***Failure to Object to Psychiatric Expert Testimony***

Clotfelter contends that trial counsel's failure to object to inadmissible expert testimony from Dr. Sorrentino and Dr. Arnold deprived him of effective assistance of counsel and a fair trial.  Clotfelter argues that both experts impermissibly rendered opinions that he was guilty of the charged offenses and that he acted with the requisite mental states.

We begin with the admissibility and parameters of expert witness testimony.  "While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude . . . . An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  (Evid. Code, § 801, subd. (a).) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. . . . When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675 (*Sanchez*).)

However, " '[a] consistent line of authority in California as well as other jurisdictions holds a witness cannot express an opinion concerning the guilt or innocence of the defendant. . . . [T]he reason for employing this rule is not

because guilt is the "ultimate issue of fact" to be decided by the jury. Opinion testimony often goes to the ultimate issue in the case. [Citation.] Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' (*People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.)" (*People v. Duong* (2020) 10 Cal.5th 36, 60-61.)

When a defendant's mental state is at issue, section 29 places additional limits on expert opinion testimony: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

1.      *Testimony of Dr. Sorrentino*

Clotfelter contends that Dr. Sorrentino impermissibly expressed an opinion that he was guilty when she testified that his "current criminal behavior" was consistent with his history of sexual offending. Clotfelter asserts that his trial counsel rendered prejudicially ineffective assistance by failing to object to the following testimony:

"Q.    Now did you form an expert opinion regarding whether Mr. Clotfelter's current conduct was consistent with his previous pattern of sexual offending?

"A.    Yes, I did. [¶] . . . [¶] It's my opinion that Mr. Clotfelter's *current criminal behavior was consistent with his previous history of sexual offending*. More specifically, it's my opinion that Mr. Clotfelter's *current behavior is*

28

*consistent with his lifelong history of grooming for the purposes of sexual molestation.* [(Italics added.)] [¶] . . .

"Q. Okay. [¶] And this opinion that Mr. Clotfelter's conduct was consistent with this previous pattern of grooming . . ., what did you base this opinion on?

"A. The following evidence demonstrates Mr. Clotfelter's ongoing grooming behavior: One, Mr. Clotfelter as he has in the past currently as it relates to the instant offenses developed relationships with families that have male children; in particular male children in the age group in which he is sexually interested. [¶] Next, Mr. Clotfelter had ongoing relationships with one of the victims, [Steven], after being told by authorities or superior individuals that that relationship should not continue. Next, Mr. Clotfelter spends [a] great deal of time around children. He also, as it relates to the incident [sic] offenses, spent quite a bit of time with both Steven . . . and [E.H. and B.H.]. [¶] Also consistent with Mr. Clotfelter's grooming behavior is the purchasing or using his finances to develop relationships or trust with families that have children in his sexual interest range. Mr. Clotfelter demonstrated this by using his financing to purchase things for [E.H. and B.H.] and family. And, lastly, the other piece of evidence that supports grooming behaviors which is consistent with what Mr. Clotfelter has done in the past is sleeping with prepubescent boys or boys in the age range that he's interested in. [¶] . . .

"Q. So ultimately what . . . did this all boil down to with respect to the defendant? What was your ultimate expert opinion and conclusion?

"A. So my opinion with *reasonable medical certainty* is that Mr. Clotfelter *continues to experience sexual interest in prepubescent boys* and that he seeks relationships that will facilitate this type of contact. It's my further

29

opinion that *the relationships he developed with Steven and [E.H. and B.H.] are such examples of these desires to have contact with these individuals*." (Italics added.)

Clotfelter further argues that Dr. Sorrentino violated section 29 when she testified (again without objection) that his current behavior was consistent with his history of grooming for the purposes of sexual molestation, and that he continued to experience sexual interest in prepubescent boys.

The Attorney General acknowledges that it is improper for an expert witness to express an opinion on whether a crime has been committed and whether a defendant did or did not have a required mental state, but contends that Dr. Sorrentino did not directly opine as such and it was not error to fail to object. We disagree.

To recap, as to the counts involving Steven, the prosecution was required to prove that: (1) Clotfelter engaged in conduct directed at a child; (2) a normal person, without hesitation, would have been disturbed, irritated, offended, or injured by Clotfelter's conduct; (3) the conduct was motivated by an unnatural or abnormal sexual interest in the child; and (4) the child was under the age of 18 at the time of the conduct. (§ 647.6; CALCRIM No. 1122.)

As for the counts involving B.H. and E.H., the prosecution was required to prove that: (1) Clotfelter contacted or communicated with a minor; (2) when Clotfelter did so, he intended to commit a lewd and or lascivious act involving that minor; and (3) Clotfelter knew or reasonably should have known that the person was a minor. (§§ 288.3, subd. (a) & 288, subds. (a), (c)(1); CALCRIM No. 1124.)

As quoted above, Dr. Sorrentino described Clotfelter's conduct as his "current criminal behavior." Had this been all that was objectionable in her

30

testimony, it might have amounted to a regrettable but incidental choice of words.  But this was not all.  After Dr. Sorrentino opined that Clotfelter's prior convictions involved grooming "for the purposes of sexual molestation," she testified that he had acted this way again and for this purpose with Steven, B.H., and E.H.  This testimony was the expression of her opinion on Clotfelter's mental state.  Because the focus of the trial was on Clotfelter's intent, i.e., were his interactions with Steven "motivated by an . . . abnormal sexual interest" (§ 647.6, subd. (a)(2)) and were his communications with B.H. and E.H. motivated by a specific "intent to commit" a lewd or lascivious act (§§ 288.3, subd. (a); 288, subds. (a), (c)(1)), this testimony was tantamount to telling the jury that Clotfelter was guilty of the charged offenses.

Dr. Sorrentino's testimony arguably further crossed over into impermissible territory when she stated that "*with reasonable medical certainty*" Clotfelter "*continues to experience sexual interest in prepubescent boys and that he seeks relationships that will facilitate this type of conduct*," and that "the relationships he developed with Steven . . . and [B.H. and E.H.] are such examples of these desires to have contact with these individuals." (Italics added.)  This testimony appears to squarely violate section 29, as Dr. Sorrentino offered an opinion as to whether Clotfelter had a particular mental state at the time he committed the charged offenses.  (*People v. McFarland* (2000) 78 Cal.App.4th 489, 495-496; *People v. Czahara* (1988) 203 Cal.App.3d 1468, 1477 (*Czahara*).)

The case law is clear that the proscription in section 29 is not limited to the use of certain words.  In *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364, the defendant unsuccessfully sought to introduce testimony from an expert that, based on defendant's inebriation and tendency to overact to stress, he fired his rifle "impulsively" at the time of the charged offense.  (*Id.*

at pp. 1361-1362.) On appeal, the defendant argued that the proposed testimony was proper because the expert would not have used the legal name of the mental state in question. (*Id*. at p. 1364.) The appellate court rejected this assertion as "game playing," explaining that "[u]nder such a rule it would be improper for a defense psychiatrist to testify that a defendant did not 'premeditate and deliberate' but would be proper to testify he did not 'plan' his actions." (*Ibid*.) Rejecting this result, *Nunn* held that "[a]n expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*Ibid*.)

Similarly here, we find unpersuasive the Attorney General's contention that because Dr. Sorrentino "did not testify in the words of the statutes or instructions" section 29 was not violated. Dr. Sorrentino testified that Clotfelter "continues to experience sexual interest in prepubescent boys," "seeks relationships that will facilitate this type of conduct," and that "the relationships he developed with Steven . . . and [E.H. and B.H.]" were "examples of these desires to have contact with these individuals." A reasonable juror would undoubtedly construe this testimony to mean Clotfelter's conduct with Steven was motivated by an unnatural or abnormal sexual interest in him (§ 647.6, subd. (a)(1); *Lopez, supra,* 19 Cal.4th at p. 289), and that his interactions with B.H. and E.H. were motivated by an intent to engage in lewd or lascivious activity with them (§§ 288, 288.3)—in other words, that Clotfelter acted with the requisite mental state required for all six charged offenses.

To conclude otherwise would render the limits imposed by section 29 meaningless. (Cf. *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1327 (*Bordelon*) [section 29 prohibits expert being asked hypothetical questions

32

that are the "functional equivalent" of asking whether the defendant had a particular intent]; *Czahara, supra*, 203 Cal.App.3d at p. 1477 ["Czahara concedes [his expert] could not state an opinion that Czahara did not have the mental state required for attempted murder. But taken together, the two opinions offered from [the expert] . . . completely negate malice aforethought"].)

We now turn to whether counsel's failure to object was prejudicial. Relying on *People v. Davis* (2009) 46 Cal.4th 539 (*Davis*), the Attorney General argues it was not prejudicial, because the jury could have drawn the same conclusions about Clotfelter's continued sexual interest in boys from evidence of Clotfelter's prior crimes that was admitted pursuant to Evidence Code section 1108. In *Davis* an expert testified at trial that the defendant's behavior in the kidnapping and murder of the victim was "consistent" with paraphilia. (*Id*. at p. 605.) The Supreme Court concluded that even if this testimony should have been excluded, it was harmless because the jury could have drawn the same conclusion, without the expert, from other evidence that the defendant had repeatedly stalked, bound, and assaulted other female victims in the past; the defendant admitted he found those attacks sexually stimulating; (*ibid*.) and the defendant told a court-appointed psychiatrist that he masturbated twice daily while thinking of the female victims of his past crimes. (*Id*. at p. 561.)

The evidence here is significantly different. Although Clotfelter had admitted in his testimony that he molested boys in the 1980's, he had been surgically castrated since then. He told Dr. Sorrentino in 2018 that he no longer gets an erection or masturbates, and that he no longer has any sexual interest in minors. He denied touching Steven, E.H. or B.H., and they did not

testify otherwise. Thus, unlike in *Davis*, the issue of Clotfelter's intent was not established by other evidence at trial.

Clotfelter's intent was the disputed issue in this case. It was undisputed that he had close relationships with Steven, B.H., E.H., and their families. The dispositive issue was whether Clotfelter's interaction was motivated by an unnatural or abnormal sexual interest (§ 647.6 (counts 1 & 2)) in the case of Steven, and whether his communication and contact with B.H. and E.H. was motivated by an intent to sexually molest them (§ 288.3 (counts 3-6)). Dr. Sorrentino's unobjected to testimony that Clotfelter had developed relationships with B.H., E.H., and Steven to satisfy his sexual interest in prepubescent boys and for the purpose of sexual exploitation was perhaps the prosecution's most compelling evidence that Clotfelter had committed the charged offenses.

It is widely acknowledged that an expert's statements are "likely to carry special weight with the jury." (*Jinro America Inc. v. Secure Investments, Inc.* (9th Cir. 2001) 266 F.3d 993, 1004; see also *People v. Kelly* (1976) 17 Cal.3d 24, 31 ["Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials"]; *People v. Lucero* (1988) 44 Cal.3d 1006, 1029 ["expert's authority and experience may persuade the jurors to a conclusion they would not reach on their own"].) Given that the fundamental issue at trial was whether Clotfelter's behavior towards Steven, B.H., and E.H. was criminal, the fact that Dr. Sorrentino, a highly credentialed psychiatrist who had taught at Harvard Medical School, said it was, was unquestionably prejudicial.

A reasonably competent attorney would have objected to this testimony, and there is no satisfactory explanation for trial counsel's failure to do so. We conclude defense counsel prejudicially erred, as it is reasonably

34

probable that the outcome of this case would have been different had counsel objected to the challenged testimony of Dr. Sorrentino. And even if this single error would not independently warrant reversal, as we discuss *post*, this case is marked by other significant evidentiary errors to which defense counsel failed to object, the combined effect of which undermines the confidence in the jury's verdict. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 361 (*Jandres*).)

"Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to the defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ['errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial'].)" (*Jandres, supra,* 226 Cal.App.4th at p. 361.) Here, there is a reasonable probability that the combined impact of defense counsel's failure to object to Dr. Sorrentino's testimony, along with errors that we discuss below, affected the jury's decision to convict Clotfelter.

2.    *Testimony of Dr. Arnold*

Clotfelter makes similar arguments about trial counsel's failure to object to portions of the testimony of Dr. Arnold, the psychologist who examined Clotfelter in 2004 and 2005 when he was in the state hospital.

The prosecutor asked Dr. Arnold, "If hypothetically you learned that *somebody in the defendant's position* was befriending families with children and subsequently spending time with those children, providing financial support to the families, purchasing gifts for the children, going on trips with the children, sleeping in beds with the children, lying [sic] or engaging in some deceitful behavior, things like that, would that cause you concern? What would you say to that?" (Italics added.) Dr. Arnold testified, "It's

unfathomable that *he* would do something like that or a person would do something like that with this type of history. So I would say that person *has either reoffended or is very close to reoffending*." (Italics added.) Defense counsel did not object to the question or move to strike the responses.

The Attorney General asserts that Dr. Arnold's testimony was not objectionable because Dr. Arnold was only responding to a hypothetical question about a fictitious person, and not about Clotfelter's guilt. We disagree.

An effective hypothetical question may well mirror the facts of the case, but it cannot be a ruse to ask for a response that will run afoul of section 29. (See *Bordelon, supra,* 162 Cal.App.4th at p. 1327 [hypothetical designed "[t]o ask whether a hypothetical avatar in defendant's circumstances would have had the specific intent required for [the charged offense] . . . would have been the functional equivalent of asking whether defendant himself had that intent"].)

When Dr. Arnold testified that a hypothetical person with the exact same history as Clotfelter has "either reoffended or is close to reoffending[,]" this was equivalent to testifying that Clotfelter had the requisite mental state and was guilty (or about to be guilty) of the charged offenses. That Dr. Arnold did not specifically reference the charged offenses or the requisite mental states does not alter this conclusion. A reasonably competent attorney would have objected to this testimony as tantamount to an opinion as to Clotfelter's guilt or mental state. We can think of no tactical purpose or sound trial strategy to justify counsel's failure to do so.

When taken together with the failure to object to Dr. Sorrentino's testimony, we conclude defense counsel's error was prejudicial, as it is reasonably probable a different result would have been obtained had counsel

36

objected to the challenged testimony of Dr. Arnold and Dr. Sorrentino.  (See *Jandres, supra,* 226 Cal.App.4th at p. 361.)

## C.    *Failure to Object to CSAAS Testimony*

Clotfelter argues that the CSAAS testimony was inadmissible in this case, and that defense counsel was prejudicially ineffective for failing to object to it.

### 1.    *Background*

In a pretrial motion, the prosecutor sought to have Dr. Blake Carmichael testify as an expert in CSAAS, arguing the relevance of the testimony: "Expert testimony regarding common reactions of abuse victims has long been accepted, not to prove that the victim was actually abused, but to dispel common juror misconceptions about typical victim behavior.  In a child molest case such evidence is 'admissible solely for the purpose of showing that the victim's reactions, as demonstrated by the evidence, are not inconsistent with having been molested.' "  (Italics omitted.)  At a hearing on the motion, the prosecutor argued that Dr. Carmichael would explain to the jury "a little bit about the victimology of sexual assault cases and why victims often don't report for lengthy periods of time or ever . . . [a] phenomenon with some of the [Evidence Code section] 1108 victims as well as the current victims in the present case."  Defense counsel did not object to the proffered testimony, and the trial court permitted it.

Dr. Carmichael was the prosecution's very first witness at trial.  He testified that CSAAS was an educational tool developed to dispel common myths and misconceptions about the behavior of children who have been sexually abused.  "[I]t really helps people understand how child sexual abuse occurs within the context of an ongoing, existing, trusting relationship with somebody that the child knows and very often cares about and loves."  He

testified that the five components of the syndrome are secrecy, helplessness, entrapment, delayed and unconvincing disclosure, and recanting or retraction. The "vast majority" of victims are sexually abused "by people they know and see regularly." Dr. Carmichael told the jury that he has encountered situations where an abuser has gotten especially close to the victim's family through church or friendship. Some victims do not disclose the abuse because they "really appreciate and look forward to the time they spend with their abuser, whether it be material goods, phones, video games, things like that." It is "absolutely a myth" that a "child who's being sexually abused wouldn't want to go back and see the person who [is] abusing them." "Kids can still love, appreciate, and seek out attention from someone who is actually abusing them."

Dr. Carmichael further testified that "most kids don't tell about being abused right away . . . 60 to 70 percent of kids don't tell within the first year, and even some of those don't tell until after they turn 18." The fact that the perpetrator "is somebody who is important or held in high esteem by the child's family" can "very directly impact a child's willingness to talk about anything bad about that person." When both child victim and adult perpetrator are male, negative connotations about male homosexuality can weigh heavily on the child's decision to report sexual abuse. A victim's family can be disinclined to report sexual abuse when they are financially intertwined with the perpetrator or have a particularly close relationship with him.

Without objection, the prosecutor also elicited CSAAS-type testimony from Sergeant Hunter and another officer (Sergeant Shulman) who each testified that in their experience it was not uncommon for children who have been sexually abused to delay reporting and/or fail to report the abuse at all.

38

In her rebuttal closing argument to the jury, the prosecutor highlighted the CSAAS testimony of these three witnesses. Clearly referring to Steven, E.H. and B.H., and responding to the defense closing argument that none of them felt annoyed or molested by Clotfelter, the prosecutor stated, "A lot has been made about how the victims never thought they were victims and they didn't act like victims and they didn't present like victims and no one noticed signs that they were victims. [Defense counsel] made a lot of that. *But that is exactly why I put Dr. Carmichael on the stand to talk to you. He's an objective expert, he knew nothing about the case for good reason: So that he could testify about victimology, about how victims do and do not react to these kind of situations, how they do and do not present as victims in this case, and he told you that victims don't always show signs of abuse.* That they will go back to their abuser and continue to love them and spend time with them sometimes for really extended periods of time. Years, even. That they won't necessarily be withdrawn, crying, they won't act the way society might sort of expect a victim of molest to act. That is just not how that works. [¶] The victims and the families don't react the way you might traditionally expect. *That's what Dr. Carmichael told you and that is what Sergeant Hunter and Sergeant Todd Shulman, who was the other expert that you heard from, testified that they actually saw in practice* in their extensive, extensive experience, training and experience working these cases." (Italics added.)

2. *Analysis*

"Expert testimony on 'the common reactions of child molestation victims,' known as CSAAS theory evidence, 'is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' [Citation.] ' "Such expert testimony is

39

needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' [Citation.]" (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).)

However, CSAAS evidence " 'is not admissible to prove that the complaining witness has in fact been sexually abused.' [Citation.]" (*Julian, supra,* 34 Cal.App.5th at p. 885.)  Similarly, an expert providing CSAAS testimony may not give " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393.)  Stated another way, the jury cannot be led to engage in the leap from: (1) many victims of sexual abuse do not disclose the abuse because they hold the abuser in high esteem; (2) the witness failed to disclose the sexual abuse; (3) the witness exhibits the same behavior as a class of actual victims of sexual abuse; therefore, (4) the witness was in fact sexually abused.

Yet this is precisely the argument that the prosecutor was making to the jury:  that it could use the CSAAS testimony to infer that Steven, B.H. and E.H. were victims of the crimes charged.  On appeal, the Attorney General concedes that the prosecutor's argument was a "misuse of the CSAAS testimony to the extent it suggests that the victims were actually sexually molested, as opposed to on the way to being sexually molested."  But the Attorney General argues the prejudicial effect of the CSAAS evidence was neutralized by the rest of Carmichael's testimony and the jury instruction that Dr. Carmichael's testimony was "not evidence that [Clotfelter] committed any of the crimes charged against him."  We disagree.

The CSAAS testimony was not relevant with respect to the evidence concerning the victims of Clotfelter's crimes in the 1980's. It was undisputed that Clotfelter committed these prior offenses, there was no testimony that those victims delayed reporting or recanted, and Clotfelter did not question their credibility at trial. And as to the underlying charges in this case, it is not at all apparent that the CSAAS testimony was relevant. B.H. and E.H. denied they had been touched inappropriately. Their parents, who were mandatory reporters, denied seeing anything troubling. There was no direct evidence to the contrary. As to the crimes alleged pertaining to Steven, we have concluded the evidence was insufficient to find Clotfelter guilty.

We can think of no tactical reason why defense counsel would not have objected to the admission of the CSAAS testimony. And no reason why defense counsel would not have objected to the improper argument in the prosecutor's rebuttal closing that used the CSAAS testimony to infer that Steven, E.H., and B.H. had been sexually abused.

Given the dearth of direct evidence that Clotfelter was sexually inappropriate with Steven, B.H., and E.H., it is reasonably probable the outcome at trial would have been different had defense counsel objected to the CSAAS testimony. Even if the CSAAS testimony and argument alone would not have been sufficient to find ineffective assistance of counsel, when combined with counsel's errors regarding the testimony of Dr. Sorrentino, and Dr. Arnold, there was prejudice, as it is reasonably probable the jury would have reached a result more favorable to Clotfelter absent a combination of these errors. (See *Jandres, supra,* 226 Cal.App.4th at p. 361.)

D.    ***Failure to Object to Propensity Evidence***

Clotfelter contends that his trial counsel was ineffective for failing to object to extensive and highly prejudicial testimony regarding his prior

crimes. The Attorney General counters that defense counsel made a tactical decision not to object to inflammatory testimony about his past because the defense trial theory was that Clotfelter was a "changed man."

1. *Governing Principles*

Evidence Code section 1101, subdivision (a), makes evidence of a person's character or trait of his character generally inadmissible when offered by an opposing party to prove the person's conduct on a specified occasion. Notwithstanding this general rule, evidence that a person has committed a prior crime, civil wrong or other act is admissible to prove a fact (e.g., motive, intent, plan, identity) other than a disposition to commit such an act. (Evid. Code, § 1101, subd. (b).) But in a criminal case where a defendant is accused of a sexual offense, evidence that the defendant previously committed other sexual offenses is not inadmissible under Evidence Code section 1101, if the evidence meets the standards for admissibility under Evidence Code section 352. (Evid. Code, § 1108, subd. (a).) Evidence Code section 1108 was enacted "to expand the admissibility of disposition or propensity evidence in sex offense cases." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) "Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Id.* at p. 915.) Such evidence "constitutes relevant circumstantial evidence that [the defendant] committed the charged sex offenses." (*Id.* at p. 920.) Evidence of prior sexual offenses under section 1108 may be considered for any relevant purpose, "subject only to the prejudicial effect versus probative value weighing process required by section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

In undertaking the familiar Evidence Code section 352 analysis, the concept of prejudice does not refer to the damage to a defense that naturally

42

flows from relevant, highly probative evidence, but instead refers to the tendency of the evidence "to evoke an emotional bias against the defendant as an individual . . . [that] has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638, quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377.)

2.    *Analysis*

Tactical decisions of trial counsel are entitled to deference, but even a deliberate decision may be an incompetent one. (See *People v. Wader* (1993) 5 Cal.4th 610, 658.) As we have noted, six percipient witnesses testified at length about Clotfelter's crimes in the 1980's. Clotfelter's defense counsel did not contest the facts surrounding these crimes, and he permitted the prosecution to question these witnesses without objection. But even when the witness testimony went well beyond the facts of the underlying crimes, as it frequently did, defense counsel did not object.

For example, defense counsel remained silent when Lois V. (mother of two of the victims) told the jury Clotfelter will *continue* to molest children "unless he's dead," that his "methods were so methodical and so calculated and took so long that anybody could be prey to [them]," and that Clotfelter continually "needs a new pool" of children to prey on. Defense counsel did not object when Mary T. mentioned that Clotfelter also molested G.T.'s two brothers, that one of these victims died shortly after Clotfelter was sentenced, and that Clotfelter had written an apology letter to her that she did not believe was "necessarily sincere." There was no objection when Brian A. told the jury how being molested by Clotfelter caused him to abandon the church and start self-medicating with drugs and alcohol at a young age. Nor did defense counsel speak up when Katherine G. told the jury about finding the list of "boys he had been involved with," how Clotfelter "destroyed" the lives

43

of children he had molested ("bright-eyed little boys with huge potential and futures that you just can't even imagine how wonderful they would been"), about communicating with Clotfelter in jail in the 1980's (he was "not even repentant" and "would not accept responsibility" for what he had done). Nor was there an objection when Katherine G. testified that she "never dreamed California would let [Clotfelter] out" of prison.

In addition, while discussing Clotfelter's prior crimes, Dr. Arnold, who had last interviewed Clotfelter in 2005, testified, without objection, that Clotfelter had admitted molesting five boys in the late 1980's (despite the in limine ruling limiting prior crimes evidence to the three victims who testified at trial), and that he placed his mouth on the penis of one of these boys.

We assume for purposes of our analysis that some of the Evidence Code section 1108 evidence of Clotfelter's prior crimes was admissible. And in fact, the jury heard voluminous evidence about Clotfelter's prior crimes from the 1980's, mostly from his victims. But there was so much more. The unobjected to testimony we have described above was highly inflammatory; it went well beyond the underlying facts of the prior crimes, which had occurred 30 years ago and long before Clotfelter's surgical castration. Witnesses testified about the length of Clotfelter's sentence (too short), the devastating effect on his victims, and their views of Clotfelter as a person. All of this would have been appropriate testimony by victims at a sentencing hearing. But applying the test for admissibility *at trial* as required by Evidence Code section 1108, the cumulative effect of this testimony was more likely to prejudice the jury and evoke an emotional bias against Clotfelter than provide probative value.

Ordinarily, inflammatory testimony may not be prejudicial if it occurs in passing. But here, as we have described it, the jury was bombarded with

44

it. The defense, apparently holding steadfast to its theory that Clotfelter was a "changed man" since he was castrated, did not object or move to strike any of the testimony that went well beyond the facts of his earlier misconduct. In the face of this prejudicial and irrelevant testimony, remaining silent fell below an objective standard of competence.

Here, there is a reasonable possibility that the combined impact of defense counsel's failure to object to this volume of inflammatory and irrelevant evidence, together with the failure to object to the expert testimony we have described above, affected the jury's decision to convict Clotfelter of the charged offenses. (See *Jandres, supra,* 226 Cal.App.4th at p. 361.)

## E. *Other Evidentiary Issues*

Clotfelter raises a host of other evidentiary issues which he claims establish ineffective assistance of counsel. For example, defense counsel failed to object when Steven testified that looking back on his relationship with Clotfelter, he now thought it was "inappropriate" "creepy" and "weird"; when Sartz testified that Clotfelter caused "all the schools" in the area to go into "lockdown" after it was discovered that he had been impersonating a military officer, and that a "Senator" Sartz contacted told him that a person impersonating an officer should get "more time" in jail; when Gary Stewart testified in response to the prosecutor's questions that he would not have trusted Clotfelter alone around his children when they were younger[9] and would not leave his grandchildren (then ages 2, 4, and 6) alone with him; when Erik Olson (church member and deputy sheriff) testified that given Clotfelter's history he was "concerned that something could happen in the

---

[9] During cross-examination, Stewart testified Clotfelter wasn't even around his children when they were younger because Clotfelter was in state prison at the time.

45

future to one of the church family members," and concerned that his wife and children had gone swimming while Clotfelter was housesitting for Olson's parents; and when Sergeant Hunter offered the opinion that Clotfelter's emails to Steven "documented a clandestine, hidden relationship between this convicted child molester and a 16-year-old boy," and that the "whole picture" of the emails demonstrated a "pattern of grooming this young man."

A reasonably competent attorney would have sought to exclude this irrelevant and prejudicial evidence, and no conceivable tactical reason excuses trial counsel's failure to do so. Even if these errors would not individually demonstrate prejudice, their cumulative effect, viewed in light of the evidentiary errors we have described above, undermines the confidence in the jury's verdict. There is a reasonable possibility that the jury would have reached a result more favorable to Clotfelter on the charges for which he was then on trial absent a combination of these errors. (See *Jandres, supra,* 226 Cal.App.4th at p. 361.)

F. *Sanchez Error*

Clotfelter argues—and the Attorney General agrees—that Drs. Arnold and Sorrentino related numerous instances of case-specific hearsay to the jury in violation of *Sanchez, supra,* 63 Cal.4th 665. Our Supreme Court held in *Sanchez* that when an expert "relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Id.* at p. 686.) "Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (*Id.* at p. 684.)

Clotfelter argues that the case-specific hearsay depicted him as someone with an irrepressible propensity to lie, manipulate, and commit

sexual offenses. Clotfelter also argues that defense counsel should have objected to every instance in which the prosecution's experts related case-specific hearsay and that there is no satisfactory explanation for defense counsel's failure to do so. The Attorney General counters that a reasonable defense counsel could choose not to object to this testimony in light of the defense theory that Clotfelter was a changed man. We need not resolve this issue in light of our conclusion that the judgment must be reversed for the reasons described above. Accordingly, we do not further analyze Clotfelter's claim of resulting prejudice.

## G. *Reversal is Required*

Much of the evidence at this trial focused on Clotfelter's prior convictions for sex crimes in the 1980's. As we have noted, the prosecution offered six percipient witnesses to testify about Clotfelter's prior sexual conduct. It was not until the third day of trial that the prosecution put on direct evidence pertaining to the charges in this case. Defense counsel's theme was that Clotfelter was a changed man since he had been surgically castrated. That tactical decision could explain why there was virtually no objection to testimony about the facts of Clotfelter's prior sexual offenses, or cross-examination of the six witnesses.[10] But it cannot explain why there were no objections to (or motions to strike) the highly inflammatory testimony about Clotfelter and his prior crimes as we have described above. Equally important, it cannot explain why there was a failure to object to the admission of the evidence we have described about the currently charged offenses. The failure to object to the testimony of Drs. Sorrentino and Arnold,

---

[10] Defense counsel cross-examined only one of these six witnesses (G.T.), asking a handful of clarifying questions to establish that Clotfelter had pled to the charge pertaining to him and been sentenced to state prison.

the improperly used CSAAS evidence, and the repeated instances of inflammatory testimony, had an overwhelming cumulative effect. Defense counsel sat on the sidelines while this unfolded.[11]

We conclude it is reasonably probable that defense counsel's errors taken together affected the outcome of this case (*Strickland, supra*, 466 U.S. at p. 694), and rendered the result of the trial unreliable and fundamentally unfair. (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 372.) We therefore reverse.[12]

_____

[11] In light of all the errors described above, we cannot help but observe that the trial court had its own duty to ensure a fair trial. (See *People v. Abel* (2012) 53 Cal.4th 891, 917.) " '[T]he trial judge "has the responsibility for safeguarding both the rights of the accused and the interest of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial." [Citations.]' " (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1387; see also § 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"].) As our Supreme Court recently noted in *People v. Nieves* (2021) 11 Cal.5th 404, 439, a trial court may "properly limit questions and interpose its own objections under Penal Code section 1044[.]"

[12] Clotfelter raises other instances of alleged ineffective assistance of counsel that we need not reach in light of our holding. These issues include trial counsel's alleged error in not requesting to bifurcate the trial on Clotfelter's prior conviction allegations, and carelessly failing to ensure that the prior conviction packets were properly redacted. Clotfelter contends the failure to redact the prior conviction packets resulted in the jury learning of several dismissed counts, arguably creating the impression he had "gotten off lightly" and that at least one of his crimes was "unrevenged." Rather than request specific redaction of the irrelevant counts, defense counsel simply asked the trial court to "do the right thing." Although the trial court indicated that it would "sanitize" the packets, other than one minor

## DISPOSITION

The judgment of conviction is reversed as to all counts. The matter is remanded for further proceedings as to counts 3, 4, 5, and 6.[13]

---

redaction, the information pertaining to Clotfelter's prior convictions was presented in its original, unredacted form.

[13] This court will forward a copy of this opinion to the State Bar. (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)

_____

Miller, J.

WE CONCUR:


_____

Kline, P.J.


_____

Richman, J.


A155659, A155683, *People v. Clotfelter*

Court:  Napa County Superior Court

Trial Judge:  Hon. Mark S. Boessenecker

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon, Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent

A155659, A155683, *People v. Clotfelter*